1
2
3
4
5
6                    UNITED STATES DISTRICT COURT

7                     EASTERN DISTRICT OF CALIFORNIA

8

9    MICHAEL HOWARD,                    )    1:06-cv-00821-OWW-TAG HC
                                        )
10                  Petitioner,         )    REPORT AND RECOMMENDATION
                                        )    REGARDING PETITION FOR WRIT
11        v.                            )    OF HABEAS CORPUS (Doc. 1)
                                        )
12   JEFF WRIGLEY, Warden, et al.,      )
                                        )
13                  Respondents.        )
     _____)

14

15        Petitioner is a federal prisoner proceeding with a petition for writ of habeas corpus  pursuant

16   to 28 U.S.C. § 2241.

17                     **FACTUAL AND PROCEDURAL HISTORY**

18        On May 9, 2005, Petitioner pleaded guilty to five counts of violating 18 U.S.C. § 1341 and

19   1342(mail fraud), and four counts of violating 18 U.S.C. § 1956(a)(1)(B)(money laundering).  (Doc.

20   9, pp. 2-3; Exh. 1, p. 1).  Petitioner was sentenced by the United States District Court for the District

21   of Massachusetts to eighteen months of incarceration.   (Doc. 9, Exh. 1, p. 2).

22        The instant petition was filed on June 27, 2006.  (Doc. 1).  On August 7, 2006, Petitioner

23   filed a motion for a scheduling order and for expedited review, claiming that the nature of his

24   allegations required immediate action by the Court.  (Doc. 6).  On August 28, 2006, the Court

25   granted Petitioner's motion for expedited review and required Respondent to file a response within

26   fifteen days of the service of the Court's order.  (Doc. 8).  On September 12, 2006, Respondent filed

27   his response.  (Doc. 9).

28

1
## JURISDICTION

2        Writ of habeas corpus relief extends to a person in custody under the authority of the United

3   States.  28 U.S.C. § 2241.  While a federal prisoner who wishes to challenge the validity or

4   constitutionality of his conviction must bring a petition for writ of habeas corpus under 28 U.S.C.

5   § 2255, a petitioner challenging the manner, location, or conditions of that sentence's execution must

6   bring a petition for writ of habeas corpus under 28 U.S.C. § 2241.  See e.g.,  Capaldi v. Pontesso,

7   135 F.3d 1122, 1123 (6th Cir. 1998);  Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 n.5 (2nd Cir.

8   1991); United States v. Jalili, 925 F.2d 889, 893-94 (6th Cir. 1991);  Brown v. United States, 610

9   F.2d 672, 677 (9th Cir. 1980).  To receive relief under 28 U.S.C. § 2241 a petitioner in federal

10  custody must show that his sentence is being executed in an illegal, but not necessarily

11  unconstitutional, manner.  See e.g., Clark v. Floyd, 80 F.3d 371, 372, 374 (9th Cir. 1995)

12  (contending time spent in state custody should be credited toward federal custody);  Jalili, 925 F.2d

13  at 893-94 (asserting petitioner should be housed at a community treatment center);  Barden v.

14  Keohane, 921 F.2d 476, 479 (3rd Cir. 1990) (arguing Bureau of Prisons erred in determining whether

15  petitioner could receive credit for time spent in state custody);  Brown, 610 F.2d at 677 (challenging

16  content of inaccurate pre-sentence report used to deny parole).  A petitioner filing a petition for writ

17  of habeas corpus under 28 U.S.C. § 2241 must file the petition in the judicial district of the

18  petitioner's custodian.  Brown, 610 F.2d at 677.

19        In this case, Petitioner alleges that the Bureau of Prisons' ("BOP's") policy limiting placement

20  in a community corrections center ("CCC")[1] to ten percent of his sentence violates federal law.

21  Petitioner is challenging the legality of the manner in which his sentence is being executed.  Thus,

22  his petition is proper under 28 U.S.C. § 2241.  In addition, because Petitioner is incarcerated at the

23  Taft Correctional Institution, Taft, California, which is within the Eastern District of California,

24  Fresno Division, this Court has jurisdiction to proceed to the merits of the petition.

25  ///

26

27        [1]Although Respondent points out that these centers are now called "residential re-entry centers,"
    and refers to them in his response as "RRC's," (Doc. 9, p. 3), for the sake of clarity and uniformity with
28  prior decisions, the Court will refer to them in this Report and Recommendation as "CCC's."

1

## **EXHAUSTION**

2       A preliminary question is whether petitioner has exhausted available administrative remedies.

3  Before filing a petition for writ of habeas corpus, a federal prisoner challenging any circumstance of

4  imprisonment must first exhaust all administrative remedies. Martinez v. Roberts, 804 F.2d 570, 571

5  (9th Cir. 1986); Chua Han Mow v. United States, 730 F.2d 1308, 1313 (9th Cir. 1984); Ruviwat v.

6  Smith, 701 F.2d 844, 845 (9th Cir. 1983).

7       The exhaustion prerequisite for filing a § 2241 petition is judicially created; it is not a

8  statutory requirement.  Brown v. Rison, 895 F.2d 533, 535 (9th Cir. 1990), overruled on other

9  grounds, Reno v. Koray, 515 U.S. 50, 54-55 (1995).  Thus, "[b]ecause exhaustion is not required by

10  statute, it is not jurisdictional."  Brown, 895 F.2d at 535.  If a petitioner has not properly exhausted

11  his claims, the district court, in its discretion, may either "excuse the faulty exhaustion and reach the

12  merits,  or require the petitioner to exhaust his administrative remedies before proceeding in court."

13  Id.; McCarthy v. Madigan, 503 U.S. 140, 144-145 (1992), superceded on other grounds, 42 U.S.C.

14  §1997(e).

15       One of the purposes of administrative exhaustion is to allow the agency an opportunity to

16  remedy its own mistakes before being brought into court, and this applies with particular force when

17  the challenged action involves an exercise of the agency's discretionary power.  McCarthy v.

18  Madigan, 503 U.S. at 144-46.  Thus, exhaustion of administrative remedies would be futile and

19  should be excused if the agency lacks authority to grant the requested relief or has predetermined the

20  issued before it.  See id. at 148.

21       Here, Respondent contends that Petitioner has not sought administrative relief of any kind

22  within the BOP, let alone fully exhausted his claims.  (Doc. 9, p. 6; Exh. 5, p. 2).  As mentioned,

23  however, futility is an exception to the exhaustion requirement.  Laing v. Ashcroft, 370 F.3d 994,

24  1000-1001 (9th Cir. 2004).  In the instant action, it is apparent that it would be futile for Petitioner to

25  exhaust his administrative remedies because he alleges he is being denied a CCC placement prior to

26  the last ten percent of his prison sentence based on formally-adopted BOP regulations, the validity of

27  which BOP strenuously maintains.  In the Court's view, therefore, Petitioner's exhaustion of his

28  ///

1    administrative remedies is not a prerequisite to the district court's jurisdiction over the case because

2    of the BOP's intractable and immutable policy against the relief sought.

3                                    **DISCUSSION**

4          Petitioner challenges the federal regulations governing the BOP's policy of limiting CCC

5    placement to the last six months, or last ten percent, of the inmate's sentence, whichever is less,1 and

6    seeks an assessment of his eligibility for CCC placement made without regard to the purportedly

7    invalid regulations.  (Doc. 1, p. 3).

8          A.  The Statutory and Regulatory Framework Governing CCC Placement.

9          The BOP regulations at issue are based on two statutes.  Title 18, § 3621(b), of the United

10   States Code grants the BOP discretion to designate a prisoner's place of incarceration in "any

11   available penal or correctional facility that meets minimum standards of health and habitability[.]"

12   In addition, at any time the BOP may "direct the transfer of an inmate from one penal or correctional

13   facility to another.  Id.   In making the initial placement designation and any transfer decisions, the

14   BOP must consider these five factors:

15              (1) the resources of the facility contemplated;
                (2) the nature and circumstances of the offense;
16              (3) the history and characteristics of the prisoner;
                (4) any statement by the court that imposed the sentence–
17                  (A) concerning the purposes for which the sentence to imprisonment
                     was determined to be warranted; or
18                  (B) recommending a type of penal or correctional facility as appropriate; and
                (5) any pertinent policy statement issued by the Sentencing Commission pursuant to
19              section 994(a)(2) of title 28.

20   Id.

21         The second relevant statute is 18 U.S.C. § 3624( c), which directs the BOP to prepare

22   prisoners for re-entry into the community near the end of their sentences.  This statute provides in

23   relevant part as follows:

24              The Bureau of Prisons shall, to the extent practicable, assure that a prisoner
                serving a term of imprisonment spends a reasonable part, not to exceed six
25              months, of the last 10 per centum of the term to be served under the
                conditions that will afford the prisoner a reasonable opportunity to adjust to
26              and prepare for the prisoner's re-entry into the community.  The authority
                provided by this subsection may be used to place a prisoner in home
27              confinement.

28   18 U.S.C. § 3624( c).

1    On March 25, 1992, the Department of Justice's Office of Legal Counsel ("OLC") issued an

2  opinion that interpreted § 3621(b) to allow the BOP unlimited authority to place prisoners in any

3  appropriate facility for incarceration, including those operated by the private sector.  16 Op. Off.

4  Legal Counsel 65, 67 (1992).  Thus, it became a common practice for the BOP to place a low-risk,

5  nonviolent offender in a CCC, a halfway house, or some other form of "community confinement,"

6  instead of committing the offender to a federal prison, pursuant to the grant of authority in § 3624(c).

7  See Community Confinement, 70 Fed.Reg. 1659, 1659 (Jan. 10, 2005)(codified at Title 28 C.F.R.

8  § 570); BOP Practice of Placing in CCC Certain Offenders Who Have Received Sentences of

9  Imprisonment ("OLC Opinion"), 2002 WL 31940146 (Dec. 13, 2002).  This practice of CCC

10  placement was considered routine, and was not seriously contested by any party.  See United States

11  v. Serpa, 251 F.Supp.2d 988, 990 (D.Mass.2003)("These practices were entirely routine and were all

12  but taken for granted by all participants: the BOP, the Probation Office, the U.S. Attorney's Office,

13  the defense bar, and the judiciary.").

14    On December 13, 2002, however, the OLC changed its interpretation of § 3621(b).  Op. Off.

15  Legal Counsel, 2002 WL 31940146 (December 13, 2002).  The OLC determined first that § 5C1.1 of

16  the United States Sentencing Guidelines did not permit the BOP to substitute confinement in a CCC

17  for a minimum term of imprisonment imposed under that guideline.  The OLC also concluded that

18  § 3621(b) does not give the BOP general authority to place an offender in community confinement

19  from the outset of his sentence or to transfer the offender from prison to community confinement at

20  any time the BOP chooses during the course of the offender's sentence.

21    Instead, under the new interpretation of § 3621(b), front-end placements are not authorized

22  and back-end offenders are only eligible for confinement in CCC's for the lesser of (i) ten percent of

23  their sentence, or (ii) the six-months period specifically authorized by 18 U.S.C. § 3624(c).  The

24  OLC reasoned that, while § 3621(b) gave the BOP the discretion to choose an inmate's place of

25  imprisonment generally, a CCC did not constitute a place of imprisonment for purposes of that

26  section.  Op. Off. Legal Counsel, 2002 WL 31940146 (December 13, 2002).  The OLC determined

27  that the authority to transfer a prisoner to a CCC came solely from § 3624(c), which limits the time a

28  ///

1   prisoner may spend in a CCC to "a reasonable part, not to exceed six months, of the last 10 per

2   centum of the term." Id.

3          Shortly after the 2002 OLC opinion was issued, the United States Attorney General adopted

4   the OLC's position and instructed the BOP to transfer all offenders residing in CCC's with more

5   than 150 days remaining on their sentence to a traditional prison facility because the use of CCCs

6   was "unlawful." Memorandum of Deputy Attorney General Larry D. Thompson, December 16,

7   2002, at 1 ("Thompson Memorandum").[2] The Thompson Memorandum recounted the conclusions

8   contained in the OLC memorandum, id. at 1-2, and concluded by explaining that a concern regarding

9   the BOP's previous CCC placement policy was its "potentially disproportionate, and inappropriately

10  favorable, impact on so-called 'white-collar' criminals." Id. at 2-3.

11         On December 20, 2002, the Director of the BOP issued a memorandum to all federal judges

12  stating that the BOP would not "use CCC's as a substitute for imprisonment," and thus the BOP

13  would no longer honor judicial recommendations to place inmates in CCC's for the imprisonment

14  portions of their sentences. Memorandum of BOP Director Kathleen Hawk Sawyer, December 20,

15  2002, at 1. The memorandum explained briefly:

16         This procedure change follows recent guidance from the U.S. Department
           of Justice's Office of Legal Counsel (OLC), finding that the term
17         "community confinement" is not synonymous with "imprisonment." OLC
           has determined that the Bureau's practice of using CCCs as a substitute for
18         imprisonment contravenes well-established case law, and is inconsistent
           with [Section 5C1.1 of the United States Sentencing Guidelines].
19

20  Id.; Dismas Charities, Inc. v. United States Dept. of Justice, 401 F.3d 666, 670-71 (6th Cir. 2005).

21  ///

22  _____

23         [2]The operative language of the Thompson memorandum is as follows:

24         "OLC has now issued a formal opinion finding that BOP's policy is unlawful.  Accordingly,
           BOP immediately should take all steps necessary to ensure that its sentencing placement
25         decisions are in full compliance with the governing law.  In addition, BOP should transfer to an
           actual prison facility all federal offenders currently residing in a CCC who, as of today, have
26         more than 150 days remaining on the imprisonment component of their sentence.  BOP shall
           give at least 30 days written notice to each such offender prior to the transfer."

27  Thompson Memorandum at 1.

28

1    The First and Eighth Circuits found this 2002 policy unlawful because it did not recognize

2  the BOP's discretion to transfer an inmate to a CCC at any time, and therefore contrary to the plain

3  meaning of § 3621. Elwood v. Jeter, 386 F.3d 842 (8th Cir. 2004); Goldings v. Winn, 383 F.3d 17

4  (1st Cir. 2004). Both Circuits held that the time constraints of § 3624(c) limited only the *affirmative*

5  *obligation* of the BOP, *not* the agency's *discretion* to place a prisoner in a CCC for a longer period of

6  time. Elwood, 386 F.3d at 846-47; Goldings, 383 F.3d at 23.

7    On August 18, 2004, in response to decisions such as Elwood and Goldings, the BOP

8  proposed new regulations "announcing its categorical exercise of discretion for designating inmates

9  to community confinement when serving terms of imprisonment." 69 Fed.Reg. 51, 213 (Aug. 18,

10  2004). While acknowledging the BOP's general discretion to place an inmate at a CCC at any time,

11  the 2005 regulations once again limit CCC placement to the lesser of ten percent of a prisoner's total

12  sentence or six months, unless special statutory circumstances apply. Id. The final rules were

13  published on January 10, 2005, and became effective on February 14, 2005 ("the 2005 regulations").

14    The final CCC designation regulations read:

15    **§ 570.20 What is the purpose of this subpart?**
      (a) This subpart provides the Bureau of Prisons' (Bureau) *categorical*
16    *exercise of discretion for designating inmates to community confinement.*
      The Bureau designates inmates to community confinement only as part of
17    pre-release custody and programming which will afford the prisoner a
      reasonable opportunity to adjust to and prepare for re-entry into the community.
18    (b) As discussed in this subpart, the term "community confinement"
      includes Community Corrections Centers (CCC) (also known as "halfway
19    houses") and home confinement.

20    **§ 570.21 When will the Bureau designate inmates to community
      confinement?**
21    (a) The Bureau will designate inmates to community confinement only as
      part of pre-release custody and programming, *during the last ten percent*
22    *of the prison sentence being served, not to exceed six months.*
      (b) We may exceed these time-frames *only* when specific Bureau programs
23    allow greater periods of community confinement, as provided by separate
      statutory authority for example, residential substance abuse treatment
24    program (18 U.S.C. 3621(e)(2)(A)), or shock incarceration program
      (18 U.S.C. 4046( c)).
25
      See Woodall v. Federal Bureau of Prisons, 432 F.3d 235, 240-41 (3rd Cir. 2005).
26
      ///
27
      ///
28

1    B. <u>Analysis of Petitioner's Claim</u>.

2    Petitioner alleges in his petition that his projected release date is December 31, 2006.  (Doc.

3    1, p. 2).  Petitioner also alleges that he has received only forty-five days of CCC placement, although

4    he contends that § 3621(b) gives the BOP discretion to award Petitioner up to six months of CCC

5    placement.  (Id.).  Petitioner argues that the BOP's refusal to conduct an assessment to award more

6    than forty-five days of CCC placement is contrary to the intent of Congress.  (Id.).  Petitioner further

7    contends that the BOP's policy for CCC placement, as expressed in the BOP's 2005 regulations,

8    conflicts with applicable federal statutes and "strips BOP of any discretion."   (Id., pp.2-3).

9    Respondent counters first by correctly noting that this Court has previously addressed this

10   precise issue contrary to Respondent's position.  (Doc. 9, p. 16).  In Horn v. Ellis, 1:06-cv-00006-

11   OWW-TAG, the Court determined that BOP's policy was contrary to the intent of Congress and

12   granted the petitioner habeas relief by requiring BOP to conduct a review of potential CCC

13   placement for Horn without reference to the BOP's own regulations.

14   In his response in opposition to the instant petition, Respondent contends that the Court erred

15   in Horn in three respects. First, Respondent contends that the Court's decision "fails to appreciate the

16   effect that the mandatory restrictions of § 3624(c) have on § 3621(b)."  (Doc. 9, p. 16).   Second,

17   Respondent contends that, in distinguishing Lopez v. Davis, 531 U.S. 230 (2001), the Court in Horn

18   "fails to appreciate the high degree of categorical discretion the BOP exercised when it listed factors

19   to essentially redefine what was considered a non-violent offense that would preclude early

20   eligibility."  (Doc. 9, p. 16).  Finally, Respondent maintains that the BOP's regulations are not

21   contrary to the Congressional intent, but rather that the "Congress deliberately left the statute open

22   for the agency to make a "permissible reading" of it," and, therefore, under Chevron, U.S.A., Inc. v.

23   Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), the Court should "defer to the agency's

24   reasonable interpretation of the statute and uphold 28 C.F.R. § 570.20-21 as a reasonable exercise of

25   agency discretion that is consistent with § 3621(b)."  (Doc. 9, p. 17).  In the course of the Court's

26   analysis below, each of these concerns will be addressed.

27   ///

28   ///

1          1.  Construction of § 3621(b) with § 3624(c).

2          Respondent contends that the BOP's exercise of discretion in rule-making is justified because

3   the BOP's interpretation of § 3624(c) and § 3621(b), as expressed in the BOP regulations, is the

4   most reasonable interpretation.  (Doc. 9, p. 9).  Respondent argues that "the two sections address two

5   different concerns and need to be considered separately."  (Id. at 14).  While § 3621 "lists the factors

6   that determine where the BOP should place or transfer an inmate," § 3624(c) only comes into play

7   "when something triggers a placement decision and a suitable facility must be found."  (Id.).

8          Respondent's argument, however, has been rejected by the three federal Circuits who have

9   addressed the issue.  E.g., Woodall, 432 F.3d at 250; Levine v. Apker, 455 F.3d 71 (2d Cir. 2006);

10  Fults v. Sanders, 442 F.3d 1088 (8th Cir. 2006).  In Woodall, the Court dismissed Respondent's

11  interpretation as follows:

12          [Section] 3624 does not determine when the BOP should consider CCC
            placement, but when it must provide it.  The clear language of [Section]
13          3624(c) mandates that the BOP "shall" assure that a prisoner is given
            appropriate pre-release conditions that are focused on re-entry, if
14          "practicable."  The statute requires the BOP not just to consider, but to
            actually place an inmate in a CCC or like facility, during the last ten
15          percent or six months of the sentence, when that is possible.

16  Woodall, 432 F.3d at 250 (emphasis supplied).

17          At no point in the 2005 regulations, however, does the BOP take into account the

18  requirement that it consider the particular circumstances of individual inmates.  By definition,

19  particular circumstances cannot be taken into consideration by the promulgation and implementation

20  of a blanket rule.  Notably, here, Congress expressed its intent that the BOP take into account, inter

21  alia, the sentencing judge's recommendation, the nature of the offense, and the "history and

22  characteristics" of the prisoner.  By their very natures, these criteria require an individualized

23  determination for each prisoner that the 2005 regulations categorically do not allow.  As the Woodall

24  Court observed, "It is simply not possible to consider individualized circumstances in the drafting

25  room before a prisoner even enters the criminal justice system."  Woodall, 431 F.3d at 248.[3]

26  ─────────────────

27          [3]Far from contesting that the BOP's regulations are "categorical" rather than individualized,
    Respondent concedes as much, stating that "[the regulations] limit the class of prisoners who are eligible
28  for RRC placement based on the amount of time they have left to serve and not on other factors
    individual to a particular prisoner."  (Doc. 9, p. 9).

1    Contrary to the 2005 regulations, the statutes, when read together, place no time limit on

2    when the BOP may consider a pre-release change of confinement.  Indeed, the BOP has "an

3    affirmative obligation" and *must* consider such a change in placement status.  See Elwood, 386 F.3d

4    at 846-847; Goldings, 383 F.3d at 23.  The BOP is not free simply to re-write Congress's

5    prescription of the factors to be considered in making that determination.  While § 3624(c) limits the

6    BOP's discretion not to consider community confinement or other pre-release alternatives *at the end*

7    of a prisoner's term, it does *no*t prohibit the BOP from doing so earlier, pursuant to a different grant

8    of discretionary authority.  Goldings, 383 F.3d at 24.  Thus, the regulations violate Congressional

9    intent by substituting an arbitrary, across-the-board application of a ten-percent maximum for pre-

10   release alternative confinement in lieu of considering the Congressionally mandated criteria in

11   § 3621 that must be the focal point of any change of confinement assessment.

12   Respondent also argues that the three circuits that have rejected the 2005 regulations used a

13   flawed analysis that permits "a discretionary provision to override a mandatory duty," a process that

14   "runs contrary to the common sense of these provisions."  (Doc. 9, p. 15).  However, § 3621(b) is

15   "discretionary" *only* in the sense that it provides "that the BOP *may* place a prisoner where it wishes

16   *so long as* it consider the factors enumerated in § 3621."  Woodall, 432 F.3d 2345.  The factors

17   themselves are *not* optional or discretionary.  Id.  Since it is these mandatory factors themselves that

18   are *not* given full force and effect under the BOP's 2005 regulations, Respondent's characterization

19   that a "discretionary" provision is being allowed to "override" a "mandatory duty," is misleading and

20   inaccurate.   As the Woodall Court noted, the legislative history of § 3621(b) clearly indicates "that

21   the BOP is 'specifically required' to consider the § 3621(b) factors...before it can properly place or

22   transfer an inmate."  Woodall, 432 F.3d at 245.

23   2. Categorical Exercise of Discretion under Lopez v. Davis.

24   Respondent next contends that the BOP's regulation is a categorical exercise of

25   administrative discretion similar to that upheld by the United States Supreme Court in Lopez,

26   531 U.S. at 243-44.  (Doc. 9, pp. 12-13).  Lopez, however, is distinguishable from the instant case.

27   In Lope*z,* the Supreme Court addressed the BOP's categorical exercise of discretion under a

28   different subsection of 18 U.S.C. § 3621, i.e., subsection (e)(2)(b), which provides that an inmate

1    convicted of a non-violent offense could have his or her period of incarceration reduced after

2    successfully completing a drug treatment program.  The BOP had issued a regulation excluding

3    inmates from early release under this provision if they were convicted of non-violent crimes

4    involving firearms.  28 C.F.R. § 550.58(a)(1)(vi)(B).  The Supreme Court upheld the regulation,

5    stating that nothing in the statute at issue prohibited "categorical exclusions."  <u>Lopez</u>, 531 U.S. at

6    243.

7        <u>Lopez</u> is distinguishable from this case because subsection (e)(2)(b) did not contain the

8    specific criteria listed in § 3621(b), which create the conflict with the BOP's 2005 regulations.  As

9    the <u>Lopez</u> Court noted, "constraints . . . requiring the BOP to make individualized determinations

10   based only on post-conviction conduct are nowhere to be found in [Section] 3621(e)(2)(b)."  <u>Id.</u> at

11   241-42.  Subsection (e)(2)(b) offers no specific criteria to be considered other than the overarching

12   criterion that only nonviolent offenders are eligible for early release.  Accordingly, the BOP can

13   make categorical decisions within that class of offenders without violating that subsection.

14       Subsection 3621(b), however, is different from § 3621(e)(2)(b), because, as explained <u>supra</u>,

15   it does indeed prescribe criteria that the BOP *must* consider in making its placement determinations:

16           (1) the resources of the facility contemplated;
             (2) the nature and circumstances of the offense;
17           (3) the history and characteristics of the prisoner;
             (4) any statement by the court that imposed the sentence -
18               (A) concerning the purposes for which the sentence to imprisonment was
                 determined to be warranted; or
19               (B) recommending a type of penal or correctional facility as appropriate; and
             (5) any pertinent policy statement issued by the Sentencing Commission pursuant to
20           section 994(a)(2) of title 28.

21   18 U.S.C. § 3621(b).

22       The second, third, and fourth factors - i.e., the nature and circumstances of the offense, the

23   history and characteristics of the prisoner, and any statement by the court that imposed the sentence -

24   cannot be fully considered without evaluating inmates on a case-by-case basis.

25       In invalidating the 2005 regulations, the <u>Woodall</u> court explained as follows:

26           The regulations do not allow the BOP to consider the nature and
             circumstances of an inmate's offense, his or her history and pertinent
27           characteristics, or most importantly, any statement by the sentencing court
             concerning a placement recommendation and the purposes for the
28           sentence.  And yet, according to the text and history of Section 3621, these

factors must be taken into account.  The regulations are invalid because the BOP may not categorically remove its ability to consider the explicit factors set forth by Congress in Section 3621(b) for making placement and transfer determinations.

Woodall, 432 F.3d at 244; see Fults v. Sanders, 442 F.3d 1088, 1091 (8th Cir. 2006).

Accordingly, and contrary to Respondent's contentions,  Lopez does not control the disposition of this action.  See Fults, 442 F.3d at 1091; Woodall, 432 F.3d at 247; Levine, 455 F.3d at 85.

3.  Administrative Agency Deference.

Respondent finally argues that, as the agency responsible for administering 18 U.S.C. § 3621, the BOP's interpretation of that statute is entitled to substantial deference as the most reasonable interpretation of the statutes.  (Doc. 9, pp. 7-9).

When faced with a challenge to an administrative agency's construction of a statute, which is implemented by that agency, a court must determine: (1) whether the language of the statute is ambiguous; and, if so, (2) whether the agency's interpretation of the statute is reasonable.  Chevron, 467 U.S. at 842-45.  "[W]here Congress has enacted a law that does not answer the precise question at issue, all [a court] must decide is whether the [agency] has filled the statutory gap in a way that is reasonable in light of the legislature's revealed design."  Lopez, 531 U.S. at 242.  However, an agency is not entitled to any deference if Congress has unequivocally expressed its intent in the statute.  See Food and Drug Administration v. Brown & Williamson Tobacco Co., 592 U.S. 120, 125-26 (2000), citing Chevron, 467 U.S. at 842-43.

Here, Respondent's argument for Chevron deference fails because the Congressional intent is clear.  Congress's intent in promulgating § 3621 was to assure that pre-release conditions of confinement be used to facilitate a prisoner's re-entry to the community.  This purpose is not ambiguous.  Woodall, 432 F.3d at 248.  The intent of Congress is also clear as to the mandatory consideration by the BOP of factors for grounds for placement.  "Even for an agency able to claim all the authority possible under Chevron, deference to its statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent."  Gen. Dynamics Land Sys. v. Cline, 540 U.S. 581, 600 (2004).  Section 3621(b) provides

unequivocally that the BOP *must* consider several factors in CCC placement to effectuate the

transition.  18 U.S.C. § 3621(b).  In contrast, however, the BOP regulations provide that the BOP

may *not* consider those factors in full.  28 C.F.R. § 570.20-21.  The conflict between the regulations

and the statute is unavoidable and irreconcilable.  See <u>Woodall</u>, 432 F.3d at 248-49.

However, even assuming, arguendo, that the statute is ambiguous, the regulation fails the

second prong of the <u>Chevron</u> standard because it is not "based on a permissible construction of the

statute."  <u>Chevron</u>, 467 U.S. at 843.   As discussed, the regulations at issue here "fail to take into

account Congress's indications that certain individualized factors should be considered in the BOP's

placement and transfer scheme."  <u>Woodall</u>, 432 F.3d at 249.   Put in the language of the <u>Chevron</u>

test, the BOP's 2005 regulations do not fill a statutory gap in § 3621(b); rather, they ignore the plain

language of § 3621(b).  Congress specifically listed the five factors in § 3621(b) that the BOP must

consider in making placement decisions.  As noted above, three of the five factors specified in that

section are not generally applicable and, thus, require individual determinations that could not have

been considered by the BOP in promulgating the 2005 regulations.  See <u>Fults</u>, 442 F.3d at 1092;

<u>Woodall</u>, 432 F.3d at 248.  The BOP may not adopt regulations that selectively edit the very statutes

the regulations purport to interpret.  <u>Levine</u>, 455 F.3d at 85.

> "Categorical rule-making, like all forms of agency regulation, must be consistent with unambiguous Congressional instructions.  And, an agency may not promulgate categorical rules that do not take account of the categories that are made significant by Congress.  Though Congress left the BOP a large territory of discretion in implementing § 3621(b), it did not leave the BOP's duties undefined.  The BOP is not empowered to implement selectively the instructions given by § 3621(b), by picking and choosing those factors that it deems most compelling."

<u>Id.</u> (internal citation omitted).

In light of the foregoing, the Court concludes that the BOP's 2005 regulations illegally

preclude the BOP from considering CCC placement at some point earlier than the last ten percent of

the inmate's sentence and also preclude BOP consideration of the statutorily mandated factors in

making such a placement, thus directly contravening the intent of Congress.   For those reasons, the

Court recommends that the petition for writ of habeas corpus be granted.

///

1

## <u>RECOMMENDATION</u>

2         Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus

3 (Doc. 1), be GRANTED.

4         This Report and Recommendation is submitted to the United States District Court Judge

5 assigned to this case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the

6 Local Rules of Practice for the United States District Court, Eastern District of California.  Within

7 twelve (12) days after being served with a copy, any party may file written objections with the court

8 and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate

9 Judge's Report and Recommendation."  Replies to the objections shall be served and filed within

10 five (5) <u>court</u> days (plus three days if served by mail) after service of the objections.  The Court will

11 then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are

12 advised that failure to file objections within the specified time may waive the right to appeal the

13 District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

14

15 IT IS SO ORDERED.

16 Dated:   **September 22, 2006**                     **/s/ Theresa A. Goldner**
   **j6eb3d**                               UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28

U.S. District Court

E. D. California